Good afternoon. Jeff Herman from Herman Law on behalf of Appellant. I'd like to reserve five minutes for rebuttal. May it please the Court. The CDA is what it is. It's a limited liability that was created to protect Internet service providers from activity that would hold them as a publisher for third-party content. What it's not is blanket immunity. And as the Ninth Circuit said in the Barnes case, the CDA provides immunity for torts that derive liability from behavior that is identical to publishing. So it's the behavior that the courts look at to see whether or not the CDA is implicated. And the courts have said we use a common-sense definition to look at what this publishing behavior is. What's its activity? So the question here is what are we alleging that Internet brands did or didn't do? Are we alleging that they failed or did something that is publishing-related? No. What we're alleging is they failed to warn. It is not publishing-related. And as such, the CDA provides no immunity and no protection. And this Court has taken that position, again, in the Barnes case. It even had two different claims there, similar fact pattern for both claims. One of them, on the claims of the negligent undertaking, implicated publishing activity. And the Ninth Circuit said, no, what you're saying in the negligent undertaking claim is that they should have edited third-party content, and that's protected by the CDA. On the other hand, the other counsel, Promissory Estoppel, even though the relationship began as one as an Internet service provider and a user, the fact that the claim that was being alleged, Promissory Estoppel, did not require the Internet service provider to engage in any kind of publishing activity. Well, the Barnes claim is based on this additional communication between the plaintiff and the company, I guess it was Yahoo, such that the Court concluded that that separate communication, separate apart from what was happening with the website, could be the basis of a cause of action. The more direct cause of action was precluded. In this case, does your client have any relationship with defendant other than that of defendant publishing your client's page or announcement on its website? Yes, no other relationship. And the facts are different than Barnes in that respect because the claim was different, but the theory is the same, because what the Court did in Barnes was to look at what the activity at issue was. What were they alleging they did or did not do? And did it go to this publishing conduct? The same thing holds true here. Even though my client became a user, and that certainly is the initiation of the relationship, the duty arises because they have a special relationship that Internet Brands then has superior information that is foreseeable that my client is at risk. It's not just a general duty. Once they have superior information that my client's at risk, that creates the duty we allege on the failure to warn. But the courts have said it's not enough simply to just look at the nature of the relationship. In fact, the court specifically said the activity boils down to deciding whether to review, edit, withdraw, is immune under 230. What's this from? You're reading from Barnes? I'm reading from Barnes. And so what the court says, okay, we're looking at the relationship there, but then we're going to go further. We need to take it to the next step and look at the activity that's issue. And really, when you look at sort of the big picture here, that's the whole purpose of the CDA. The CDA was never intended to provide blanket immunity for Internet companies. The CDA was specifically designed to provide protection so that Internet companies were not being held liable for editing or not editing third-party content. We don't want to hold Internet companies liable for third-party content. In this case, we're not seeking to do that. What we're seeking to do is to say, hey, you had specific information that my client was at risk, and you should have warned her. Why is this case different from the MySpace cases? Because in the MySpace cases, there was no specific information, there was no allegation of a failure to warn. What they were alleging in MySpace specifically was that the failure of MySpace was not to engage in age verification software, which by its nature is getting into editing third-party content. If we were alleging here that Internet brands should have gone on to my client's user profile and edited her information and take out information that could compromise her, then that would fail under the CDA. That would fall in line with MySpace. That's not what we're alleging. Now, in MySpace, I don't know if they had a failure to warn case, because I don't know that there was specific information that MySpace had that put that particular user at risk. It wouldn't be hard to imagine a failure to warn claim in that factual context, would it? Yes, well, there is no general failure to warn claim. In fact, if we look at the law and the restatement of torts, I think it's 388, which talks about failure to warn in a situation of chattel, the duty arises when somebody has superior information that's not generally available, and they've reason to believe that their user or their buyer is not aware of the information. In the MySpace case, it's generally known that kids who go on the Internet and post user profiles are at risk from potential predators. I'm not sure the kids know that, though. The concern is that this kind of, opening the door to this kind of claim is going to mean that essentially every website is going to have to post a warning against all sorts of things that might happen, or otherwise would be vulnerable to a claim that, well, you knew it, I didn't, you should have warned me. Well, the claim still has to pass muster at the district court level in terms of making a valid claim for failure to warn. Of course, that's not an issue here. We're just talking about the CDA. We're not alleging there is a general failure to warn of known harms. Same thing with the... Well, that's driven by state law, though. So to suggest that state law might not give protection or might not provide a cause of action really doesn't solve this question. To the extent the CDA is intended to protect the Internet provider, I take it your position is there's no protection against a claim. If a state decides to have a very low standard or a low bar for a failure to warn claim, that's applicable to the Internet provider as well.  is that the CDA was designed to protect Internet companies from, the question is what? It's from being held liable for editing or not editing third-party content. That's not the claim we have here. What the court, I think, is suggesting is a more blanket immunity, which does not exist. And the courts should not be expanding it. It's a very limited statute, a very limited law that gives a very specific protection. And what the legislators were concerned about is good Samaritans, is that a company should be able to go in and edit or not edit, in a good faith, third-party content. And if they do or if they don't, they're not going to be held liable. But if you're trying to differentiate your case from a general duty to warn, isn't the provider always going to have superior information to the consumer? Well, what we allege here is a very specific fact pattern of specific superior information of a particular nature that put my client at risk that was not available to the general public, such as predators online. That is general information. No one is claiming that there's superior information to know there's predators online. I could think of an example where there's an Internet site that knows that there's a particular predator going after specific kinds of users, and the users don't know that, similar to our case, where there may or may not be a duty to warn. But what this court is being asked to look at is whether or not the CDA provides that kind of immunity. And I think it would be an expansion of the CDA for this court to grant immunity for an activity of protecting a failure-to-warn claim that has nothing to do with publishing activity. But my point is that the providers are always going to have a legal department that has files on abuses of providers. They're going to know things in those files that the consumer is not going to know. And if they know those things, I'm not sure how you differentiate your case. Well, then I think we're getting into whether or not there is a valid claim, and that's for, I think, the district court or jury to determine whether or not there was a duty to warn. The question here is whether or not there's immunity under the CDA. And the question we're discussing here is not about the CDA. The question we're discussing is whether or not there is a viable failure-to-warn claim. And clearly, all the cases that the courts have interpreted, the CDA, have always focused on whether or not we're asking an Internet service provider to engage in publishing-related activity, editing, reviewing, etc. It's not implicated here. Well, if this predator had gone on the Internet and contacted the plaintiff, you were saying that in those circumstances, would there be a duty to warn? And isn't adding something to material that's on the Internet editing or changing it? Well, I think that actually is more closely to the Match.com case, which was recently decided. And what there was there was that there was a, we'll call him the bad guy, who posted a profile and an innocent user. And the bad guy assaulted the innocent user. And the claim was that Match.com should have gone in and posted some warnings, or rather, I'm sorry, done some editing, not posting warnings, done some editing to the user's profile. And what the court said was that what they're alleging is they negligently failed to warn, I'm sorry, is that there was nothing for Match.com to negligently misrepresent or negligently fail to warn about others other than the user profile's website. In other words, the profile was there. And they're not suggesting that they could go in and edit it, because that would be protected by the CDA. And so in our case, we're not going there. We're saying there is this duty to warn, independent because of specific information, unlike in the Match.com case, where there was no unique information, it's just what was on the user profile. Did you want to save the balance of your time? Yes, I do. Thank you. You may do so. Before we start the clock, let me inquire as to whether there's going to be a division of time or what arrangements have been made. Yes, Your Honor, there will be a division of time. I'll use 10 minutes of the 15 minutes allotted, and Mr. Crum will use the remaining 5. So I've been advised by the clerk to watch my time for the 10 minutes. Thank you. Thank you. Good afternoon, Your Honors, and may it please the Court, Daniel Collins, Munger, Tolson, Olson, on behalf of Appellee Internet Brands. The claim in this case is barred by the plain language of Section 230 of the CDA because it's predicated on treating an interactive computer service, and there's no dispute that that's what we are, as the publisher or speaker of information provided by another. And that's true, even if we accept for purposes of the argument here that the complaint should be understood as effectively amended to allege that the only posting was her posting of her contact information, and then there was a contact that was outside of the website itself. And the reason why that's true is precisely because of the application of the standard that this Court adopted in the Barnes case. The Barnes case said that whether or not a claim treats an Internet service provider as a publisher turns on whether the duty quote, derives from the defendant's status or conduct as a publisher or speaker. Well, in the Barnes case, wasn't that the case where the boyfriend had put on the offensive material and the plaintiff wanted it off? And so the speaker in that case, the plaintiff was trying to make the provider, the speaker of the nasty stuff on the web. Now, what are the words that are being spoken here by the provider that bring into play this case? It's the literal act of publication, making public. It is the fact that duty here is alleged to arise not just from the fact that we have specialized knowledge. The case law is clear. But the publisher of what? The publisher of the fact that we published her Internet profile with her contact information, which she was advised to not. That's the same thing. The statute says treated as, suggesting that somebody else's words are being put into your client's mouth. And that's not what's happening here. That's not the claim here. You're trying to say that because the relationship between the two evolves in some fashion from the company posting her information on its website, that's the source of the liability. But what Barnes says is to ask whether the duty derives from the status or conduct as a publisher. The duty that's alleged here is a special relationship and the only thing about that relationship, and it has to be a special relationship and it has to be a risk of harm that arises in the course of, derives from that relationship, what makes the relationship special. My opposing counsel conceded that the only relationship is as the publisher of her content. But then what you're saying is that everything related in any way to publication or speaking that your client does cannot give rise to liability. And if Congress wanted to give that kind of blanket immunity, why couldn't it simply say, the provider shall be immune for any act arising from or relating to its publishing activity? And it didn't say that. There must be something that's not covered. Well, the Barnes case establishes a... Well, the Barnes case had a special fact and the special fact was one of the employees of the provider made a promise. That's not part of its publishing. Here there's a special fact also, which is that the company came into knowledge of these particular abusers. That doesn't happen all the time and so I'm less worried about opening the floodgates than you are. This is a pretty strange fact pattern, it seems to me. But Barnes involved two different claims. One of them also was a negligence claim and the court said that you have to analyze what are the duties... what are the elements of the duty and whether or not the duty theory under state law turns on the fact that the defendant engages in publishing activity. And here the duty is that... to the world where it might result in contacts by bad people without giving a warning. So it directly relates... the duty itself relates only to our status as the publisher, the one who brings her information to the world. That's a fact-specific determination. Barnes illustrates on its own facts that as you apply it to different circumstances and different claims, that test about the elements of the duty and how they intersect with the role as a publisher is a very fact-specific test. We're not arguing that it's a blanket immunity. It's one where you apply the standard and it produces the result that this conduct, where the only alleged basis that gives rise to the duty under state law is our act of publication and... It's really not, though. That's my difficulty with your position. It's not just the publishing. It's the fact that during an acquisition, lawyers did a review of a file and they found in the file a particular fact that's not part of publication. That's the due diligence that any company would do in acquiring another company. But the problem, Your Honor, is that the Nally case makes clear that the specialized knowledge alone is not, under state law, sufficient to give rise to a duty. You must have the special relationship. And here, the special relationship only comes from the relationship as the publisher. And the reason... And you win the state law claim, but that doesn't mean that you're immune. No, but Barney says that you have to at least look at the content of state law in terms of defining the elements and seeing whether or not they rest on the status as a publisher. And Your Honor's hypothetical would be correct if the rule under California law were opposite, that specialized knowledge were alone sufficient to establish it. Then I think that would follow, but that's clearly not the law in California. It does have to involve a special relationship and a risk that arises from the special relationship, and it's impossible to thread that needle here without dispositively relying on the fact that we publish her information to the world at large. I look at Barnes, and immediately before the part you quote, it begins to put it another way. So I look at the sentence before to see what Barnes is talking about, and it says, What matters is whether the cause of action inherently requires the court to treat the defendant as the, quote, publisher or speaker, close quote, of content provided by another. And the focus of that appears to be as it was in the Barnes context, ex-boyfriend posts something, plaintiff tries to hold Yahoo liable because it's on the website. That's the direct purpose of the CDA. Here it's almost serendipitous that the relationship between your client and the plaintiff happens to evolve from the fact that she posted on the website. But your client's not being held liable for what she posted as the publisher or speaker of that content, and that's what the CDA seems to be aimed at. But it is, because if she didn't post it on our website, pursuant to what's alleged to be a special relationship between us and her, we wouldn't be here. There wouldn't be any basis. How is there any sense that the CDA is intended to protect your client in that context as opposed to being held accountable for what somebody else says? The whole point of the CDA appears to be that you shouldn't be treated as the speaker of what somebody else has put up because you can't necessarily control what somebody else put up. If you tried to, and this goes back to the New York Stratton case, prodigy was held liable because it imperfectly protected. So the CDA is enacted in order of preventing the prodigy in that case, or the prodigies of the future, to being held responsible for trying to act as a good Samaritan by trying to edit but not doing it perfectly. This is an entirely different context. So how is it the CDA is intended to protect your client simply because your client's business has to do with a website? As Barnes indicated, even the fact that the genesis of the act may have been a specific concern about defamation resulting from a specific case doesn't mean that the language that Congress chose doesn't go further and the policy doesn't go further. What suggests the policy does go further to protect a case like this? As we explained in our petition, I believe that the policy does go further in the sense that when you're talking about social networking sites which bring the content of other people, by definition, to the world at large, if there is, on that basis, going to be a special relationship to now warn of all potential harms, then that will induce considerable caution in allowing the sort of free posting and flow of third-party information, which in this case... How is that affected at all here? It is affected here in the sense that we're being sought to impose with tort liability based on the fact that we published her profile which contained her... I would expect you to, if you wound up on the merits of this, to argue that there was no special relationship within the meaning of California law. I don't see what that has to do with whether or not your client is being treated as a speaker within the meaning of this statute. Of course, Your Honor. As I've made clear in the petition, we don't believe that this claim exists under California law, and we would argue that on remand. But I'm assuming, arguendo, because the issue's not before the court, applying the Barnes analysis, we need to look at what's the theory that they've asserted, and they've asserted this special relationship theory, and assuming that it exists, it only exists by virtue of the fact that we're a speaker, and that would induce the very caution that Congress is concerned about, that about posting the information of third parties, it would cause us to either have to overwarn, pull back information, edit out her personal profile, and scrub information that might give rise to duties. It results in precisely the sort of concerns about clogging up. What could possibly your client do that would solve this problem that involves the scrubbing of content? We could have removed her personal, her email. It wouldn't have solved the problem, because the problem is that the predators were out there potentially aimed at anybody who posts on your client's website. But they were able to... They could contact anybody who posted. So what you're saying is that editing perhaps in refusing to give contact information, but you could also satisfy the duty of warn without doing anything to the postings, simply by giving a warning. She posted her email address on the main page that's publicly available, which she was advised not to do. And if she had not done that, then contacts could only have occurred through the website and through members in the website. Her doing that was critical to the fact that they contacted her outside the website. So by removing that, we could have eliminated the risk of outside non-members, such as these men, contacting her. So yes, it does implicate the editing concerns. I see I'm using up my time, and I want to... We're helping you, and... Allow time for me. We'll allow amicus counsel his fair share of time. Okay. Thank you, Your Honor. Thank you, Your Honors. Pat Carome from WilmerHale, representing the amici. I think there are several misapprehensions that may be at work here in this case. Let me first point out that there's no... The chilling effect that would stem from a ruling like this would be not marginal. It would be enormous. That's... I think we have to look at the fact that today's Internet services are platforms for a torrent of communications flowing back and forth between users of websites. And many of the Internet's most valuable and innovative services do what Model Mayhem aims to do. That is to enable people who otherwise have no interactions or knowledge about one another to meet one another online via websites or other interactive platforms and to engage in communications online that lead to real-world transactions. Can I ask you about that? I think your policy argument is really strong. And if I were sitting in Congress, I might write a broader immunity provision than is currently in the statute. But the question we have is not what is a good thing. It's was Congress in fact thinking about this problem or did it use language that is sufficient to encompass this problem? And that's a much harder question. Your Honor, I think that Congress did indeed use language to do just that. What happened here, this factual scenario, is not really a very unusual one on the Internet. I think it would be a mistake to think of it as unusual. Somebody has actual knowledge that there are predators out there luring people to South Florida, drugging them and raping them? That's usual? These are heinous facts, Your Honor. But the contours of this fact pattern are actually not unusual. The fact that the online service provider has knowledge that its service is being used in a harmful way to really hurt people... And Congress intended to say, and you don't have to let anybody else know that you've got this knowledge that that bad stuff is going on out there? Your Honor... In a provision labeled Good Samaritan? Congress took knowledge out of the equation for a couple of reasons. In Zarian, AOL was alleged to have known that Mr. Zarian was receiving death threats. And Mr. Zarian was calling AOL to say, take this down, stop it, take it down. And he said that they didn't do it fast enough and he kept receiving death threats. They had actual knowledge, it was alleged, of something very serious happening. In Barnes, Yahoo was alleged to have had actual knowledge from Cecilia Barnes herself contacting Yahoo repeatedly and giving them knowledge that this horrible posting profile of her was up and people were visiting her on her website seeking sexual liaisons. That was also horrible. Congress decided to take knowledge out of the equation for two reasons. One, if knowledge of harmful content flowing through their services or over their services or being intermediated by their services were sufficient to be a basis for liability because knowledge is very easy to allege and because there are literally a torrent, a fire hose of communications flowing over these services, there would be instances where it could at least be alleged that there was knowledge and some failure to take action. And Congress said and understood that that kind of liability would have an enormous chilling effect on these sorts of internet platforms. There's a second reason why knowledge is something that Congress did not want to be a basis for liability. Congress saw, and the Zaran Court and many other courts have pointed this out, that one of the key purposes of the statute, reflected in part by the Good Samaritan language in the title, is to encourage, or I'm sorry, to remove disincentives for service providers to engage in responsible self-policing and monitoring of their services as the Ninth Circuit in roommates.com in the Ambach decision recognized. One of the purposes of Section 230 was to remove disincentives for online providers to stick their head in the sands and not know what kinds of things are happening through their services. If a failure to warn claim requires that there be knowledge of something, that the service provider didn't act to take action to... And yet states recognize failure to warn causes of action. That seems to speak much more to the cause of action for failure to warn than it does to the protection provider or the CDA. Your Honor, I'm not sure that's right. What would happen? You know, Craigslist, for example. It does a lot to warn its users... Craigslist is a big, rich company. Why shouldn't it be required to do a lot? Not an especially big company, Your Honor. It's got a small handful of employees, actually. And it's able to function in that way because of the CDA. Craigslist does a lot to create avenues for its users to warn when scams are happening. And there are buttons to immediately notify Craigslist. And Craigslist takes action, removes postings, disciplines posters. Craigslist, under this rule, if it's not protected from failure to warn claims, it would have a strong incentive to stop doing that. Such knowledge, actually, becomes a basis for liability. It becomes a basis for negligence liability or a basis for a failure to warn. And actually, it would precisely disserve Congress's intent to encourage self-promotion...  would you be precise as to what you mean? Knowledge that one of the people using the website or the service is using it in a manner to falsely communicate and injure users, either online or in real-world interactions that follow online meetings. I mean, that's what a lot of my clients do. They intermediate literally billions of members engaging every day in millions of communications leading to hundreds of millions of real-world meetings. Because there are bad people in the world, some of those online interactions that lead to real-world transactions are inevitably going to lead to one form or another of harm. And it's not possible to... Justice occurred with Model Mayhem. Model Mayhem here, what did it do? It was a platform that allowed Julie Doe... I'm sorry, Jane Doe and these two miscreants in Florida to communicate with one another. That was all it did. It had no other function to facilitate that communication. I think... And because of the peculiar facts that we have here, we're on a motion to dismiss. So we accept the plaintiff's pleading, but we also know, because of peculiar facts, that the proprietor knew about the miscreants in Florida. Just like AOL knew that somebody was using its service... I have trouble looking at the statute, seeing how a provision that's entitled... Well, let's actually get its title. Protection for Good Samaritan Blocking and Screening of Offensive Materials gets turned into a hall pass, a get-out-of-jail-free card, when it has something to do with the Internet. It's not a get-out-of-jail-free card at all, Your Honor. It is not. It is not immunity with respect to communications that the service provider creates itself. It is not an immunity, as we know from Barnes, when there's an independent legal event, an independently significant legal event, like a contract or the equivalent of a contract that's enforceable in law to be created. That's a limitation. The statute... Congress put a number of express limitations in the statute itself. Federal criminal liability is not affected. Intellectual property is not affected. Certain types of privacy claims are not affected. The fact that Congress reached out to those areas... None of that is mentioned in this subsection. Pardon me? None of that is mentioned in this subsection. That's part of Section 230. It's part of the statute, yes, but we're focused on subsection C. You're getting your proposed immunity from subsection C. That's right. And it doesn't seem to me to be the kind of universal immunity that you're advocating for. No, I'm saying those exceptions are exceptions to how Section 230C applies. It doesn't apply in those circumstances. Congress saw that it carefully cabined how this statute is to be construed. The fact that it placed those exceptions on how Section 230C-1 operates shows that it understood that it was to be a very broad statute and provide a very broad protection. And the trouble that Your Honor is having, I think, with the notion that while this statute is focused on good Samaritan blocking of content, that gets to the question about removing disincentives from responsible self-policing. If you tell entities like my clients that if they have knowledge, if they get knowledge while they're doing their operations of misuse, of horrible things that their users are doing, and because there are billions of users of these services, there are going to be horrible people out there, unfortunately. But if you tell them that the fact that they have knowledge, they gain knowledge of that, creates state law causes of action against them, they have a strong disincentive to engage in that sort of responsible self-policing. It would do exactly what Congress sought to undo when it enacted the statute. Zara made that very clear. Other cases have made that clear. We gave you ten minutes instead of five. Is there anything else you must say? I would say that the court need not be focused only on whether this treats Internet brands as the publisher or speaker of Jane Doe's profile. If the court has hesitancy to embrace that, the court should alternatively realize that this failure to warn cause of action treats Internet brands as the publisher or speaker of Flanders' communications back to Jane Doe. He was a user of the website. He was only able to do that because he was a user of the website. The website did nothing but intermediate communications, and the statute by its terms does not insist that the harmful communication have flowed through the wires of the defendant's service. Thank you very much. Thank you, Mr. Herman. Thank you. I'd like to start with this whole notion of the incentive argument. It really doesn't make sense to me. What Apelli and Amici Counsel are saying is that if there's liability under the fact pattern here, then there's a disincentive to warn potential victims of a harm. But that's exactly what happened here. On their own, Internet brands and Model Mayhem was aware of this heinous crime spree, this heinous actions by these two men, yet they failed to warn anybody on the site about the harm. So somehow they're saying now, though, that if they're liable for that, now they're not going to warn them in the future. Well, we already know without being liable, they're not warning them. So this incentive argument doesn't really make sense to me. Can I ask you, what quality of information is required in order to trigger, in your view, and exempt the nonimmune cause of action? For example, if a user posts a comment that says, I was ripped off by this guy, does that give the Internet service provider the obligation to warn everybody on the website that this guy is ripping someone off? They don't have confirmation. They don't know it's true. I mean, your case, I agree, is easier, but where are we supposed to draw the line? Right, well, I think that's a good example of where there would be immunity. Somebody posting something on the site, we're not asking that Internet service providers police themselves, and that that information is available to the public. Someone posting something online, there's no requirement they police themselves. We're saying, in the unique fact pattern, where they do have specific information on their own, outside of what's being put on their website, that the user doesn't have that puts them in danger, in this specific case, then there is the duty to warn. And so, we're not looking to expand this to policing everything that's put on the website. I understand where appellees come from when they're making the argument that, when you look at the Barnes case, there is that one sentence that says, you look at whether the duty derives from the defendant's status or conduct as a publisher. If you take that sentence alone, without any of the other dicta, any of the other comments or statements in the ruling, then I understand why they're latching on to that, because they want to say, in this case, the relationship does initiate between the publisher, and Internet provider, and my client, and therefore, that should be the end of the day. But that's not what the CDA says, and that's not what the court said in Barnes. The court went further in Barnes, and followed that by saying, we're going to boil this down to look at what the activity, the wrong, is being alleged. Does that activity, what they did or didn't do, go to something that a publisher would do? And so, in Barnes, the court held once, under the negligent account, that there was no liability. There was immunity, because that would require them to edit content. On the promise or estoppel, no. It's the opposite answer. And here, that same theory applies. What we're saying was wrong, was done wrong here, has nothing to do with editing third-party content. They are free to edit third-party content as a good Samaritan. They're not being held liable because of what someone else published on their website. They're potentially being held liable because they failed to warn under California law with a unique fax and a special relationship. When should they have warned? Well, certainly after they filed, by the time they filed a lawsuit against the seller of the website, telling them they were going to lose all this money because there's these men coming on their website in this particular scheme and raping women. So we know then that they knew. They never warned. And so maybe that's a question for the jury. Usually we don't have those facts. We know more about this case than ordinarily we would know at the stage of a motion to dismiss. And the concern expressed by your colleagues is that this is going to open the door to an enormous number of due-to-warn cases, and it's easy for me to see that. So what is the proprietor of a website to do? They're almost inherently going to have more knowledge than the individual users. We know there are predators out there. Does that mean that anybody operating Model Mayhem, MySpace's current equivalent, Facebook, whatever else, simply has to have a prominent notice warning someplace telling people use this website at your own risk? Right. We do have unique fax here. And I think the law... But the CDA isn't built for the unique fax. So we're going to be writing something that will be a standard in cases where the fax aren't quite so unique. Take out the piece, for example, whereby we know that Internet brands had actual knowledge. The average case is going to come in with a complaint that alleges knowledge, because otherwise you don't have a cause of action. But that's all we're going to know. And I can imagine Internet service providers being concerned. Gee, if anybody can come in and allege almost anything, we're at risk. So how do we protect ourselves? We give a warning. What's the warning going to consist of? And why isn't that going to dry up the business? Okay. I have two responses. One, first, the question is, what was the CDA built for? What the CDA was built for is to protect Internet service providers from being held liable for third-party content. And so it doesn't cover this case. But you're raising the concern that, okay, even if it wasn't supposed to cover this, are we opening up the floodgates then to all these failure-to-warrant claims? And I think the answer is no. And that's because if you look at the examples given by the Amici in their brief, they said that all of a sudden Twitter would be liable because of Occupy Wall Street notifying people about meetings. Well, and the same thing with Facebook being liable because they were posting videos of people doing the ice bucket challenge and people were getting hurt. That's a far different fact pattern than what we're alleging. And the reason those claims would fail is because they would fail as a duty-to-warrant case. Because there is no duty-to-warrant generally. And that's where we get back to the unique facts of this case, which makes this case different. We're saying there were unique facts of a danger that my client and other users were not aware of. In the Twitter issue with Occupy Wall Street, it's well known. There was nothing unique that they had information, that Twitter had. But if you're saying the duty-to-warrant, if those cases would fail based on the duty-to-warrant, you are requiring all those cases against the ISPs to go at least through discovery to summary judgment because those cases won't have the specifics that we have here. And that's what your adversaries are concerned about. What I'm saying is those cases wouldn't get by a motion to dismiss on the failure to warrant. Isn't it adequate under California and every other law to simply say the defendant had actual knowledge without specifying what the knowledge was? Well, they'd have to allege that they had... They'd allege knowledge generally. Right. They would have to allege that they had unique, specific knowledge that was not available to the public that put their client at risk. So, yeah, anyone can allege anything. Every duty-to-warrant complaint will have those words. Anybody can allege anything. And unique, specific knowledge. Right, but we're getting... Respectfully, I think we have to get back to the CDA and whether or not the CDA protects it. Anybody can allege anything. And you could allege something to try to get by a law. It doesn't mean you have a valid claim. It means you're going to try to get past it. The question for this court is whether or not the CDA provides immunity for this type of claim. And I don't see anything in the case law or in the plain language of the statute that gives that immunity. And I think the problem is being overstated in terms of the concern because we do have unique facts. We can prove specific knowledge that was not available to the public, particularly my client who then suffered from it. Any other... If there's no other questions, I have... I left Amici Council by saying is there anything else you must tell us? I'll find out the same from you. I think you've probably covered everything you intended to cover and I think you've answered our questions and answered them well. But if there's anything else you feel the need to say... Just, you know, we request the court to reverse and remand and I think the court got it right the first time in the opinion. I haven't heard anything today that was new or changes the court's reasoning. And so we urge the court to... say that it got it right the first time. Thank you. We thank you. We thank all counsel for your helpful arguments in this complicated case. We are adjourned.
judges: Cogan, Schroeder, Clifton